U8 CIV 6318

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT WILKINSON, Derivatively on behalf of ITT CORPORATION, | No. |
| Plaintiff, | |
| vs. | |
| STEVEN R. LORANGER, CURTIS J. CRAWFORD, CHRISTINA A. GOLD, RALPH F. HAKE, JOHN J. HAMRE, RAYMOND W. LEBOEUF, FRANK T. MACINNIS, LINDA S. SANFORD, and MARKOS I. TAMBAKERAS, | **VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| Defendants, | |
| vs. | |
| ITT CORPORATION, an Indiana Corporation, | |
| Nominal Defendant. | |

Plaintiff Robert Wilkinson, for his Verified Complaint by and through his undersigned attorneys, allege the following based on, *inter alia*, the Plea Agreement, Statement of Facts, and associated documents filed in connection with the guilty plea entered by ITT Corporation ("ITT" or the "Company") entered in connection with *United States of America v. ITT Company*, Cr. No. 07-22 (W.D. Va.), as described below. All facts relating to Plaintiff and his own acts are pled on personal knowledge, while other facts are pled on information and belief.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant ITT against certain members of its Board of Directors ("the Director Defendants") who served during the period of time encompassing the acts complained of herein and certain ITT Managers and an outside law firm (named herein as John Does), seeking to remedy defendants' breaches of fiduciary duties and other violations of law that have caused damage to ITT. This case arises out of a criminal proceeding in which ITT pled guilty on March 27, 2007 to federal felonies involving the willful export of defense articles without a license and the willful omission of statements of material fact in arms control exports. As stated in the Plea Agreement, *"ITT agrees that it is pleading guilty . . .because ITT is in fact guilty."* In connection with this Plea Agreement, ITT agreed to pay *$100 million* in shareholder money in criminal fines, penalties, and forfeitures. ITT also agreed to a deferred prosecution agreement with respect to the criminal charge of willful violation of the international traffic in arms regulations (ITAR) and export of defense

1

articles without a license, and agreed to pay for the costs of an independent monitor and staff to monitor its compliance with the deferred prosecution agreement and federal law. In the words of the United States Attorney who oversaw the prosecution, "ITT managers created an atmosphere where U.S. export laws were viewed as obstacles to getting business done. This atmosphere led to the transfer of sensitive military technology to the Republic of China, and others."

2.     Named herein as "John Doe" defendants are four managers of ITT's Night Vision Division (the "John Doe defendants Managers A, B, C, and D") whose conduct while employed as decision-makers with managerial authority within ITT was, in large part, responsible for the government's criminal investigation and the criminal charges to which ITT pled guilty (collectively, "the Manager Defendants"). The lawsuit also names as a defendant the outside law firm (the "John Doe defendant law firm") that conspired with the managers and with ITT to cover up and conceal defendants' conduct from the government's investigators. The John Doe Defendants' conduct as described herein was the proximate cause of the damages that ITT suffered as a result of defendants' participation in, reckless failure to prevent, or aiding and abetting the illegal export of technical data, drawings, and specifications relating to military night vision systems, and the illegal omission of material facts from required arms export reports submitted to the government, causing those reports to be patently misleading and false. The Director Defendants failed to exercise good faith in carrying out their duty to prevent such acts, and to pursue appropriate legal and remedial action once these activities were fully uncovered.

Over a period of many years, The John Doe Defendants instituted and carried out an elaborate and complex scheme of deceit, subterfuge, and concealment directed against agencies of the federal government to facilitate their scheme and plan of (a) subverting the export control laws of the United States and (b) exporting classified information dealing with military night vision systems to foreign countries in violation of multiple criminal laws and government regulations. The motive behind this scheme, which compromised the safety and welfare of American combat troops during a war and eroded the national security of the United States, was simply to make additional profit, at the expense of our soldiers, the government, and ultimately the Company itself.

3.    At all relevant times, ITT was the leading manufacturer of night-vision equipment for the United States. ITT is currently the twelfth largest supplier of sophisticated defense systems to the U.S. military. In a gross abuse of the trust and responsibility bestowed upon ITT to enhance our military's success and to preserve our nation's safety, ITT's executives threatened our national security in a direct and substantial way by providing foreign countries with classified technical data relating to military night vision capabilities.

4.    By sharing top secret military data relating to night vision equipment with foreign entities, ITT's executives single-handedly threatened to strip our soldiers of the advantage they formerly enjoyed in combat operations against military adversaries who did not have access to this equipment. As the United States Attorney for the Western District

3

of Virginia explained, "The criminal actions of this Company have threatened to turn on the lights on the modern battlefield for our enemies and expose American soldiers to great harm." There can be no doubt -- and, by its guilty plea, ITT has so acknowledged -- that ITT's executives jeopardized our national security and the safety of our military men and women on the battlefield.

5.    In the course of a wide-ranging criminal investigation, various government agencies, such as the Department of Justice, the Department of Defense, the Bureau of Immigration and Customs Enforcement, and Homeland Security discovered that ITT's executives had disseminated defense-related technical data to Singapore, the People's Republic of China, and the United Kingdom, without notifying or obtaining approval from the State Department. This technical data related to laser counter-measures for military night vision systems, designated as defense articles on the United States Munitions List, as well as to helmet-borne night vision technology. The State Department classified the technology for the laser counter-measures as "Secret - No Foreign," meaning it could not be shared even with friendly governments like Britain, and certainly not with potential strategic threats, such as China.

6.    Although, as the U.S. Attorney for the Western District of Virginia stated, American soldiers were "the principal victims of ITT's crimes," and although the harm to the Company and its shareholders is monetary and not potentially fatal, the consequences of the conduct described herein have been, and will continue to be, severe for ITT and, by

4

extension, its shareholders. For example, in addition to the $100 million in penalties and forfeitures described below, the Company is now the subject of independent monitoring.

7.      As a result of defendants' misconduct, a criminal information dated March 26, 2007 was filed against ITT in a criminal action captioned *United States of America v. ITT Company*, Cr. No. 07-22 (W.D. Va.), charging ITT with three felony counts of violating the Arms Export Control Act of 1976, 22 U.S.C. § 2778 and specified sections of ITAR, 22 C.F.R. §§ 127.1(a) & 127.3. The size of the penalties imposed upon ITT pursuant to its guilty plea demonstrates how severely the government regarded ITT's transfer of such sensitive military technology to foreigners. On March 27, 2007, ITT agreed to pay a total payment of *$100 million* in penalties and forfeitures in connection with its guilty pleas to the charges. The penalties are as follows: ITT will pay an upfront $2 million criminal fine ($1 million for each felony charge), pay an upfront $20 million penalty to the State Department, and forfeit to the federal government $28 million in proceeds derived from its illegal actions, a portion of which will be shared with state, local, and federal law enforcement agencies to reimburse them for the cost of their work during the investigation that led to the criminal charges. Within the next five years, ITT may either pay the remaining $50 million fine or invest dollar for dollar in the research of advanced night-vision technology, to which the United States government will obtain all rights -- and which technology the government will share with any competing defense contractors for future contracts -- to ensure that members of the U.S. Armed Forces will have access to "the most capable night vision equipment in the world." The $50 million

5

will also be used to cover the cost of government monitors to ensure that ITT does not again illegally export sensitive technology. Any amount of the $50 million penalty that remains unspent after five years must be immediately paid to the United States. As the United States Attorney stated, ITT will pay this last $50 million "in restitution to the victims of their crimes -- the American soldier."

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00 exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it otherwise would not have.

9.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events, actions or omissions to act giving rise to the claims occurred within this judicial district. In addition, nominal defendant ITT's principal place of business is located in this district.

## PARTIES

10.     Plaintiff Robert Wilkinson is a citizen of the state of Washington and is the owner of ITT common stock, which he has held at all relevant times.

11.     Nominal Defendant ITT is a Company organized under the laws of Indiana with its corporate headquarters located at 1133 Westchester Avenue, White Plains, New York 10604. ITT supplies advanced technology products and services in several growth

markets. It plays a vital role in national and international security through its defense communications and electronic products, space surveillance and intelligence systems, and advanced engineering and related services. ITT has become the leading manufacturer of night-vision equipment for the United States Armed Forces.

12.     Defendant ITT is named as a nominal defendant herein solely in a derivative capacity. This action is brought on ITT's behalf and no claims are asserted against it.

13.     Defendant Steven R. Loranger ("Loranger") has served as Chairman of the Board, President, and Chief Executive Officer of ITT since June 28, 2004. He is a citizen of New York.

14.     Defendant Curtis J. Crawford (Crawford) has served as a director of ITT since 1996. He is a citizen of California.

15.     Defendant Christina A. Gold (Gold) has served as a director of ITT since 1997. She is a citizen of Colorado.

16.     Defendant Ralph F. Hake (Hake) has served as a director of ITT since 2002. He is a citizen of Michigan.

17.     Defendant Dr. John J. Hamre (Hamre) has served as a director of ITT since 2000. He is a citizen of the District of Columbia.

18.     Defendant Raymond W. LeBoeuf (LeBoeuf) has served of ITT as a director since 2000. He is a citizen of Florida.

19.    Defendant Frank T. Macinnis (Macinnis) has served as a director of ITT since 2001. He is a citizen of Connecticut.

20.    Defendant Linda S. Sanford (Sanford) has served as a director of ITT since 1998. She is a citizen of New York.

21.    Defendant Markos I. Tambakeras (Tambakeras) has served as a director of ITT since 2001. He is a citizen of Pennsylvania.

22.    Defendants Loranger, Crawford, Gold, Hake, Hamre, LeBoeuf, Macinnis, Sanford, and Tambakeras are collectively referred to as the Director Defendants.

23.    The John Doe Defendants named herein are four managers of ITT's Night Vision Division who had direct, personal responsibility for causing ITT to commit the criminal offenses to which it has pled guilty (named herein as John Doe defendant managers A, B, C, and D, respectively), and an outside law firm that knowingly concealed ITT's illegal conduct from the United States government.

**Obligations of the Director Defendants**

24.    The Director Defendants, by reason of their corporate directorship and/or executive positions, are fiduciaries to and for the Company's shareholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's shareholders.

25.    According to ITT's Schedule 14A Proxy Statement filed with the SEC on April 1, 2006, the role of ITT's Board is "to oversee the actions and results of management.

In discharging its responsibilities, the Board of Directors will act in the best interests of the Company and its shareholders." The Board also "sets policy for the Company and advises and counsels the Chief Executive Officer and senior executives who manage the Company's business and affairs."

26.    Accordingly, each Director Defendant owed ITT and its shareholders the duty to exercise due care, diligence, and loyalty in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed ITT the duty of full and candid disclosure of all material facts related thereto.

27.    To discharge these duties, the Director Defendants were required to exercise reasonable and prudent supervision over ITT's management, policies, practices, controls, and financial and corporate affairs. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

a.    manage, conduct, supervise, and direct the employees, business, and affairs of ITT in accordance with federal laws, rules and regulations, and not to violate federal law, rules, and regulations, including the criminal laws of the United States;

b.    ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by ITT;

c.    remain informed as to how ITT was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or illegal practices, to make reasonable investigation in connection therewith, and to take steps to correct that condition or practice;

9

d.      supervise the preparation, filing, and/or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by ITT, and to examine and evaluate any reports of examinations, audits, or other information concerning the financial state of ITT, and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

e.      exercise reasonable control and supervision over ITT's officers and employees;

f.      maintain and implement an adequate system of internal controls at ITT, including financial, accounting, and management information systems;

g.      examine and evaluate any reports of examinations or investigations by government agencies concerning the practices, products, or conduct of ITT officers, directors, or employees, to supply true, accurate, and complete information to all government agencies at all times, and to ensure that no information supplied to any government agency is incomplete, false, or misleading.

h.      assure that the assets of the Company and its subsidiaries are utilized in the most effective manner and that and capital expenditures and appropriations are reviewed; and

i.      preserve and enhance ITT's reputation as befits a public Company, and to maintain public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations.

### Obligations of the Corporate Responsibility Committee

28.    In their capacities as directors, defendants Crawford, as Chair, along with defendants Gold, Hamre and Tambakeras, served on the Board's Corporate Responsibility Committee. The Corporate Responsibility Committee is responsible for, among other things:

a.    reviewing and making recommendations concerning the Company's roles and responsibilities as a good corporate citizen;

b.    reviewing and considering major claims and litigation involving the Company and its subsidiaries;

c.    regularly assessing the adequacy and effectiveness of the Company's Code of Corporate Conduct and reviewing any violations of the Code; and

d.    examining the Company's programs and policies for effecting compliance with laws and regulations, including international and environmental laws and regulations.

29.    Defendants Crawford, Gold, Hume, and Tambakeras are collectively referred to as the "Corporate Responsibility Defendants."

### Obligations of the Audit Committee

30.    In their capacities as directors, defendants Hake, as Chair, along with defendants Gold, Hamre, and LeBoeuf served on the Board's Audit Committee. The Audit Committee is responsible for, among other things:

11

a.    reviewing with management and the independent auditors the effect of regulatory and accounting initiatives on the Company's financial statements;

b.    reviewing and discussing with management the types of information to be disclosed and the types of presentations to be made with respect to the Company's earnings, press releases, and rating agency presentations;

c.    monitoring and discussing with management and the independent auditors the quality and adequacy of the Company's internal controls and their effectiveness;

d.    updating the Board on a regular basis with respect to matters coming to its attention which may have a significant impact on the Company's financial condition or affairs, the Company's compliance with legal or regulatory requirements, and the performance and independence of the independent auditors and the internal audit function;

e.    reviewing all material related-party transactions before initiation of the transaction and making recommendations to the Board for approval or disapproval; and

f.    reviewing and approving procedures for receipt, retention, and treatment of complaints received by the Company.

31.    Defendants Hake, Gold, Hamre, and LeBoeuf are collectively referred to as the "Audit Defendants."

## Obligations of the Compensation and Personnel Committee

32.    In their capacities as directors, defendants Tambakeras, as Chair, along with defendants Crawford, MacInnis, and Sanford served on the Board's Compensation and Personnel Committee.   The Compensation and Personnel Committee is responsible for, among other things:

a.    approving and overseeing administration of the Company's employee compensation program, including incentive plans and equity-based compensation plans;

b.    evaluating senior management and chief executive officer performance; and

c.    evaluating and making regular reports to the Board on matters concerning management performance.

33.    Defendants Tambakeras, Crawford, MacInnis, and Sanford are collectively referred to as the "Personnel Defendants."

## Obligations of the Nominating and Governance Committee

34.    In their capacities as directors, Defendant MacInnis, as Chair, along with defendants Hake, LeBoeuf, and Sanford served on the Board's Nominating and Governance Committee. The Nominating and Governance Committee is responsible for, among other things:

a.    developing, annually reviewing, updating, and recommending to the board corporate governanance principles for the Company;

13

      b.      evaluating and making recommendations to the Board concerning the composition, governance, and structure of the Board; and

      c.      determining desired Board skills and attributes, and conducting searches for prospective board members whose skills and attributes reflect those desired for the Board.

35.      Defendants MacInnis, Hake, LeBoeuf, and Sanford are collectively referred to as the "Governance Defendants."

## DEMAND ALLEGATIONS

36.      Plaintiff has not made any demand on the Board of Directors of ITT to institute this action because such demand would be a futile and useless act for the following reasons:

      (i)      The ITT Board has proven itself to be unwilling to bring remedial action against wrongdoers that have caused the Company substantial harm regarding conduct of which the Board was aware. ITT was forced to pay a fine of over $100 million to settle criminal litigation concerning its violations of the Federal export laws. The ITT Board made no effort to recover any of these damages from the known wrongdoers.

      (ii)      There was a sustained and systematic failure of the Board to exercise oversight, in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure

to take any action for such an inordinate amount of time resulted in substantial corporate losses. The directors' decision to not act was not made in good faith and was contrary to the best interests of the Company;

(iii)   The Board has made no effort to recover any portion of the fines levied against it from the principal wrongdoers;

(iv)    The acts complained of herein constitute criminal acts and violations of fiduciary and common law duties owed by ITT's Board of Directors and these acts are incapable of ratification;

(v)     The defendants intentionally breached and/or recklessly and/or negligently disregarded their fiduciary duties, choosing not to address the matters raised by the AG Complaint, including ongoing violations of previously negotiated Consent Agreement. Although the Company was already the subject of government scrutiny, the defendants allowed the improper conduct to continue and failed to take appropriate remedial actions;

(vi)    The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their criminal acts were revealed;

(vii)   The known principal wrongdoers are in a position to, and do, dominate and control the ITT Board of Directors, paying them high

annual and monthly fees to assure their compliance.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(viii) The acts complained of herein are illegal and unreasonable and thus are incapable of ratification;

(ix) In order to bring this action for breach of fiduciary and common law duties, the members of the ITT Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such actions; and

(x) The members of the ITT Board of Directors, including each of the defendants herein, receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of ITT.  Bringing an action or even adequately investigating other directors, who have the power to terminate a director's employment, would not likely occur.  The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

## DERIVATIVE ALLEGATIONS

37.    Plaintiff brings this action derivatively on behalf of ITT to enforce its claims against the Director Defendants and the Joe Doe defendants, which claims may properly be asserted by the Company but which it has failed to assert.

38.    The wrongs complained of herein occurred during the period when plaintiff was an ITT shareholder. Plaintiff continues to hold his ITT shares. Hence, plaintiff has standing to bring this derivative action on behalf of ITT to recover damages for all of the conduct described herein.

39.    Plaintiff will fairly and adequately protect the interests of ITT and its shareholders in enforcing the rights of ITT against the named defendants. Plaintiff's attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of ITT to insure its rights and those of its stockholders. Plaintiff has no interests adverse to the Company.

## SUBSTANTIVE ALLEGATIONS

40.    The government's investigation of ITT began in August 2001, when special agents of the Defense Department's Criminal Investigative Service (DCIS) were made aware that employees of ITT Night Vision (ITT NV), a division of ITT located in Roanoke, Virginia, had illegally sent a classified government document designated "Secret" and "NOFORM" ("no foreign") to an unauthorized facility in the United Kingdom (U.K.) Pursuant to a 2002 referral from DCIS and the Customs Service, a federal prosecutor was assigned to the investigation. During the ensuing four years, the government uncovered a

17

consistent pattern of violation of federal export laws at ITT NV *going back to the 1980s* and continuing, despite the fact of the on-going investigation, to 2006.

### ITT NV Export Compliance Background

41.    ITT NV has produced night vision equipment for the American military for more than 30 years, during which time the government has awarded it many millions of dollars pursuant to contracts to develop and produce, in conjunction with government scientists and engineers, new night vision equipment requested by the military.  Such night vision equipment is deemed critical to the United States' war-fighting capabilities.  The equipment is extremely sensitive, and is highly sought after by U.S. allies and enemies alike.

42.    Recognizing the inordinate sensitivity of U.S. military night vision equipment and technology, the State Department restricts export of such defense articles -- including technical data, drawings and specifications, services, and equipment related to military night vision systems -- pursuant to the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations (ITAR).  Pursuant to 22 U.S.C. § 2778, it is a criminal offense willfully to fail to obey ITAR provisions. Indeed, certain of the technical documents and information related to military night vision equipment are so sensitive -- and, in the wrong hands, so potentially damaging to the United States -- that the documents and information are protected as classified information. Willful or grossly negligent transfer of such material to a person not authorized to receive it is a criminal offense pursuant to 18 U.S.C. §§ 793(d) and 793(f).

18

43.    ITT NV was well aware of the law's requirements, including the necessity to obey all relevant ITAR regulations. But ITT failed to establish a system to ensure compliance with the relevant federal export laws. Throughout the 1980s and 1990s, ITT NV employees who attempted to ensure ITT's compliance with ITAR regulations were viewed by some ITT NV managers as obstacles to getting business done. So severe was the lack of support from certain ITT NV managers that one ITT NV employee who insisted on following the export laws felt it necessary to inform her direct manager, named herein as John Doe defendant Manager A (Manager A), that she would not ever break the law, falsify documents, or break government regulations, and that she worked at ITT NV to do a job to the best of her ability and to make a life for herself and her family, not to go to jail for anybody, including ITT NV.

44.    This employee's concern that Manager A might instruct her to break the law was grounded in a firm basis in reality. For example, in November 1998, Manager A asked an ITT NV employee to send sensitive export-controlled night vision equipment to a foreign customer for which ITT NV did not have an export license authorizing permanent transfer of such equipment. The employee told Manager A that she was willing to apply to the State Department for an export license. Manager A responded that the State Department would never approve such a license, and the employee agreed. Nonetheless, despite the clear understanding that ITT NV did not have a license for the transfer and that the State Department would not approve such a transfer, Manager A ordered the employee to make the illegal transfer anyway. In protest of this direct order, the employee wrote on

19

the shipment paperwork that she had been directed to transfer the night vision equipment over her objections.

45.     The employee later informed Manager A that she would never break the law again and that he could fire her if he wanted.  The employee then informed appropriate personnel at ITT Defense, the ITT management group that oversees, *inter alia*, ITT NV, about the entire incident.  Instead of firing or disciplining Manager A, ITT Defense placed Manager A into a position where he was designated as the ITT NV official responsible for ensuring that the ITAR regulations he had so blatantly violated were enforced.  Moreover, neither ITT NV nor ITT Defense informed anyone in the government about the illegal transfer of the highly sensitive export-controlled night vision equipment.  The government learned about this squalid affair only through the course of the criminal investigation.

### False and Misleading Statements Relating to Export Consignments

46.     ITT NV regularly and routinely loaned or consigned export-controlled night vision equipment to foreign customers for evaluation and testing.  In each such instance, ITT NV was required to obtain a temporary export license from the State Department's Office of Defense Trade Controls Licensing, and each temporary export license required that ITT NV ensure that the equipment be returned during the 4-year license period.  Throughout the 1990s, however, ITT NV failed to secure return of much such equipment during its alloted 4-year period, and as a result lost track of numerous pieces of state-of-the-art night vision equipment, many of which remain missing.

47.     On April 13, 2000, an outside law firm acting for ITT NV -- named herein as John Doe Defendant Law Firm (Law Firm) -- sent a Preliminary Notification of Voluntary Disclosure (Preliminary Disclosure) to the Acting Director of the Compliance Analysis Division, Office of Defense Trade Controls, in the State Department (ODTC). The letter stated in pertinent part: "[ITT NV] recently discovered apparent violations of the ITAR that involve ITT's loans and consignments of night vision equipment to foreign persons." A copy of this letter was sent to corporate counsel for ITT Defense. On May 19, 2000, the Law Firm sent a second letter to ODTC on behalf of ITT NV, providing a "disclosure, as well as a description of mitigating factors and corrective actions." The May 19 letter stated in pertinent part, "Upon realizing that it had a compliance issue with respect to these temporary exports, ITT took corrective action described below." The Law Firm attached to the May 19 letter a certification signed by an ITT NV manager, who was designated as a person whom ITT NV had designated to sign on its behalf, stating that "all of the representations made in connection with the voluntary disclosure are true and correct to the best of the Company's knowledge and belief."

48.     The Law Firm intended the April 13 and May 19 disclosure letters to create the impression with the decision-makers at the State Department that ITT had only "recently discovered" its temporary export license non-compliance problems, and that, "[u]pon realizing that it had a compliance issue with respect to these temporary exports," ITT NV immediately addressed the issue and did everything within its power to rectify the violations. The Law Firm and ITT NV reinforced the impression of "corrective discovery

21

followed by swift corrective action" by ITT NV's repeated references to the two disclosure letters in its ensuing correspondence and negotiations with the State Department.

49.     In part based on reliance on the impressions that the disclosure letters created, the State Department ultimately elected not to refer the ITT NV temporary export license issue to the Justice Department for prosecution.   Instead, the State Department allowed ITT to combine these violations with two other serious sets of export compliance violations into a single civil consent agreement that was executed on October 25, 2004. ITT was required to pay an $8 million monetary penalty, but did not have to admit any wrongdoing.  Most importantly, ITT avoided the major impact of a prospective debarment from obtaining future export licenses from the State Department.  In addition, the Company obtained the State Department's agreement that it "disclosed voluntarily all information concerning the facts and circumstances of the alleged violations. . .and has fully cooperated with the [State] Department."

50.     The reality, however, was precisely the opposite.   The government's subsequent criminal investigation established that counsel for ITT Defense and the Law Firm intentionally withheld from the State Department material facts, information, and circumstances about the export license violations in an effort to limit the potential penalties and consequences that the government might otherwise have imposed on ITT. Specifically, the April 13 letter's use of the phrase "recently discovered" was designed to create -- and did create -- the impression that ITT NV had complied with the pertinent ITAR regulations by reporting the consignment license violations near the time of their

discovery. The government's subsequent criminal investigation, however, revealed not only that ITT NV had not discovered the consignment license violations near the time of the April 13 letter, but that a number of ITT NV employees and managers were in fact aware of some of the consignment license violations since at least the mid-1990s. In fact, by May 17, 1998 -- more than two years before submission of the April 19, 2000 letter -- an extensive and detailed list of "PAST DUE CONSIGNMENT EQUIPMENT" had already been compiled and circulated to at least *27* ITT NV managers and employees from most of ITT NV's major departments. A second such memorandum, dated April 28, 1998, listing an additional 35 specific night vision consignments that had not been returned in a timely fashion was also widely circulated within ITT NV. Some of the consignment licenses listed in the memorandum had expired as far back as November 1990.

51.    As importantly, the criminal investigation revealed that ITT managers and counsel for ITT Defense were discussing whether and when to disclose the consignment license violations to the government as far back as at least the summer of 1999. The evidence obtained by the government established that the Law Firm and counsel for ITT Defense intentionally delayed the disclosure of the myriad consignment license violations until they had completed their own investigation. Moreover, the government investigation revealed that in March 200 counsel for ITT Defense was specifically informed that ITT NV employees had been aware of the consignment license violations at least as early as March 17, 1998. Despite this knowledge, counsel for ITT Defense did not correct the

23

false statement in the April 13, 2000 letter that ITT had only "recently discovered" the consignment licensing violations.

52.    During an April 17, 2000 meeting called to review a draft of what would become the May 19 letter to ODTC, the Law Firm (which was drafting the disclosures) and counsel for ITT Defense were specifically informed that ITT NV had been aware of the consignment license violations since at least March 17, 1998. The words "recently discovered," however, remained in the draft until ITT Defense's top export compliance manager argued that use of the phrase "recently discovered" was false and misleading. Then, and only then, were those words removed from the draft letter. Moreover, the Law Firm made no effort, then or at any other time, to inform the government that the phrase "recently discovered" used in the April 13 letter was false and misleading. In fact, the Law Firm, joined by counsel for ITT Defense, specifically argued against telling the government about the March 17, 1998 discovery date. Even when ITT Defense's top export compliance manager argued that it was a material omission not to inform the government of the March 17, 1998 discovery date, the outside attorneys at the Law Firm continued to argue that ITT should not raise the issue because, "no matter how you slice it," the failure to disclose the consignment license violations for years after their discovery would make ITT look really "sloppy." Neither ITT nor its counsel ever disclosed the March 17, 1998 discovery date to the State Department, or the fact that the "recently discovered" language in the April 13 letter was false and misleading.

53.    The government's criminal investigation also revealed that ITT's statement in the May 19, 2000 letter that "[u]pon realizing that it had a compliance issue with respect to these temporary exports, ITT took corrective action" was false and misleading because few if any of the corrective actions specified in the May 19 letter had taken place, not only in the mid-1990s, but even by March 17, 1998, the date of the "PAST DUE CONSIGNMENT EQUIPMENT" memorandum.    Despite the fact that many people at ITT NV were aware of the consignment license violations by at least March 1998, ITT took virtually no significant corrective action in this regard until the summer of 1999, when a small group of ITT NV employees was tasked with attempting to locate and recover the missing night vision equipment -- a task they could not perform because ITT give them no meaningful resources or support.    All of the other so-called "corrective actions" listed in the May 19 letter did not take place -- or, if they took place at all, did not occur until very near the April-May 2000 time period.

54.    For example, ITT purported to hire an export license manager, as part of the May 19 letter's solution to "ensure that similar issues do not recur."    But he was given virtually no resources to accomplish the mission of export compliance.    Within two months he had quit, stating in his resignation letter, "I knew when accepting the job that Night Vision had many problems, but as things have now turned out the problems are greater than anyone could imagine."

## Export Violations to a Singapore Company

55.     Since the 1980s, ITT NV has purchased almost all of its night vision optical assemblies from a company located in Singapore (Singapore Company).  Throughout the course of the relationship, ITT NV worked collaboratively with the Singapore Company on a wide variety of different optical designs.  This typically involved ITT NV's routine provision of export-controlled technical specifications and drawings, which the Singapore Company would work on, in conjunction with ITT NV engineers, to design and create the required optical and related mechanical designs.  After production and testing of the prototype optical assemblies, ITT NV purchased the finished optical assemblies from the Singapore Company.

### A.     Pre-September 2000 Export Violations

56.     Despite knowing that the transfer of export-controlled technical data, including specifications and drawings, was illegal without a State Department export license, ITT's executives failed to obtain any export license authorizing transfer of technical data from ITT NV to the Singapore Company until October 24, 1994.  Between October 24, 1994 and April 2, 1999, ITT's executives NV submitted applications for and obtained three limited export licenses (DSP-5 License for Permanent Export of Unclassified Technical Data) permitting transfer of certain specifically identified export-controlled drawings.  In submitting its applications for these licenses, ITT's executives violated the law by falsely claiming that the shipment of the drawings listed in the licenses was a "completely new shipment," when in fact ITT NV had illegally transferred many of

the same drawings to the Singapore Company before the license applications were even submitted.

57.     Even after ITT NV obtained the three specific export licenses, it continued to violate the law by transferring to the Singapore Company export-controlled technical data not covered by the limited export licenses.  In addition, ITT violated the restrictions and provisos that the State Department placed on the licenses.  For example, the licenses limited the exports to "build to print" technical data, *i.e.*, "producing an end item. . .from technical drawings and specifications (which contain no process or know-how information) without the need for additional technical assistance" (quoting ITAR).  The symbiotic relationship between ITT NV and the Singapore Company, however, far exceeded the "build-to-print" relationship authorized by the licenses.  Thus, two of the export licenses required ITT NV to execute purchase orders with the Singapore Company that contained detailed and specific limitations on what the Singapore Company could and could not do with the sensitive documents transferred thereunder before procuring any product from the Singapore Company.  Despite the fact that ITT NV procured tens of millions of dollars of products from the Singapore Company while the licenses where in effect, ITT NV failed to include the required statements of limitations in any of their purchase orders from the Singapore Company, and, though required to do so, failed to file any of the purchase orders with the State Department.

58.     By early 2000, a number of ITT NV managers and employees were aware that the Company was violating ITAR by exporting controlled documents, services, and

information to the Singapore Company without a license and by violating the limitations of the export licenses it had obtained. In the face of ITT NV's impending disclosure to the State Department of its violation of ITAR consignment license rules, the Company decided to seek State Department approval for a Technical Assistance Agreement (TAA) that would allow the Company to share specifically identified export-controlled technical data and services with the Singapore Company. In March 2000, an ITT NV employee was tasked with preparing a draft TAA for submission to the State Department. This employee was informed by his manager, John Doe defendant Manager B (Manager B), who was ITT NV's main contact with the Singapore Company, that ITT NV was only now applying for a TAA because of "the recent heightened controls," and that "there had been specific requirements on the previous licenses. . .that had not been followed."

59.    After learning this information, the employee alerted higher level ITT personnel at ITT Defense, including counsel for ITT Defense. Despite this alert about the systemic and continuous export violations involving the Singapore Company, legal counsel for ITT Defense decided that ITT was "not in a position to make a disclosure about this issue" given the fact that ITT was about to disclose numerous ITAR consignment license violations. ITT decided not to inform the State Department of the Singapore Company-related export violations. In fact, it was not until 2004, when ITT NV was preparing to reveal a series of violations relating to the ITT NV/Singapore Company TAA, that ITT gave the government even a hint of these violations. The full extent of the export violations was revealed only during the government's criminal investigation.

**B.**     <u>Post-September 2000 Export Violations</u>

60.     ITAR requires that a TAA provide information "in terms that are as precise as possible," and that all defense articles including technical data such as drawings and specifications designed for export be "described by military nomenclature, contract number, National Stock number, nameplate data, or other specific information." ITAR also requires that a TAA applicant make a statement in the transmittal letter accompanying the TAA "identifying the U.S. Government contract under which the equipment or technical data was generated, improved, or developed and supplied to the U.S. Government, and whether the equipment or technical data was derived from any bid or other proposal to the U.S. Government."

61.     In preparing a draft of the TAA, ITT NV employees put together an Annex to the TAA (TAA Annex) containing a list of specific drawings and specification numbers for the documents they wished to export to the Singapore Company pursuant to the anticipated TAA. Significant efforts were expended to ensure that the TAA Annex was as complete as possible because everyone involved in the process understood that only specifically listed documents (and their updates/revisions) would be able to be exported pursuant to the TAA if it was approved as submitted. A copy of each of the specified drawings and specifications listed on the TAA Annex was attached to the TAA for review when ITT NV submitted it to the State Department for approval on May 10, 2000. ITT made it clear that the documents that would be transferred were limited to three specific night vision systems, specifically, the PVS/7, the PVS/14, and the ANVIS night vision

29

systems. Moreover, the TAA Annex made clear that ITT NV was requesting permission for a limited "build-to-print" type of relationship with the Singapore Company, stating in relevant part, "No manufacturing or process data will be provided to. . .[the Singapore Company] under the TAA.

62.    The State Department approved the TAA request in a letter dated September 11, 2000, imposing a series of very restrictive limiting provisos. Among these were provisos that expressly did *not* authorize (a) the shipment of hardware; (b) the release or offering of manufacturing technology, systems optimization/integration know-how, or design know-now; and (c) any production without an approved manufacturing license agreement. The State Department added these restrictive provisos in an attempt to limit what ITT NV could do under the TAA because (a) the night vision technology was extremely sensitive and (b) Singapore was a well-known conduit for the transfer of military technology to the People's Republic of China, a prohibited destination. The State Department expected that ITT NV would share the documents, but only the documents, listed in the TAA Annex, explore the possibility of a limited relationship with the Singapore Company, and then come back to the State Department for explicit approval if ITT NV wished to engage in any of the activities outlined in items (a) through (c) above. After receiving the State Department's approval/limitation letter, and ITT NV Manager signed the TAA on behalf of ITT on September 18, 2000. Once he received a copy of the

signed TAA and the approval/limitation letter, the Managing Director of the Singapore Company signed the TAA on September 22, 2000, thereby making the TAA effective as of that date.

63.    ITT NV proceeded to ignore the limitations built into the TAA and the State Department restrictions placed on the TAA. ITT NV continued to export export-controlled drawings and specifications to the Singapore Company that were not covered by the TAA or any export license, exactly as if these restrictions and provisos did not exist. ITT NV also violated the TAA provisos by shipping hardware to the Singapore Company and by producing millions of dollars of product without authority. In a letter dated December 19, 2003, ITT admitted to the State Department that it had been in production for years with the Singapore Company, in direct and continuous violation of the "no production" proviso. The December 19 letter stated that it would not supply night vision goggles to the military unless the "no production" proviso was lifted. Faced with the military's need for night vision goggles during an ongoing war, the State Department lifted this proviso.

## Illegal Export of Classified Information; Export Violations Relating to the LIF

### A.    Background

64.    Night vision technology is critical to the military's war-fighting capabilities, and having the most capable night vision systems gives U.S. combat military personnel a critical battlefield advantage over the enemies of the United States. To preserve this advantage, the military pays close attention to weapons that might damage, degrade, or destroy night vision equipment on the battlefield. One of the battlefield threats to night

31

vision equipment is laser weapons, certain of which are effective against such equipment. To prevent damage or destruction of night vision equipment that might leave a pilot or soldier night-blind at a crucial moment on the battlefield and result in his death, the U.S. military has developed laser countermeasures, one of which is an optical addition to night vision equipment called a light interference filter (LIF). The LIF is composed of an underlying glass lens (substrate lens) coated with a series of specialized coatings that is mounted in a metal housing.

65.    Because of LIF's critical nature and the sensitivity of the technology involved, the government classified certain portions of the written specification for the LIF as Secret. The classified LIF specification is so sensitive that it is not only classified as "Secret" but, pursuant to the March 7, 2000 "Security Classification Guide for Laser Protection Material," was also given the special designation "NOFORN" (No Foreign). This designation means that the classified LIF specification cannot be shared with *any* foreign country, including the United States' closest military allies. In addition to the classified LIF specification, all LIF drawings are export-controlled and may not be exported without a State Department license.

66.    Even if the classified LIF specification did not carry a "No Foreign" designation that prevented its export to any country without exception, obtaining the necessary verification of clearance and proper government authorizations for an export of classified material is a cumbersome and enervating process, a process which is necessary to prevent the damage to national security that is likely to occur from disclosure to an

unauthorized or uncleared foreign person or entity. The National Industrial Security Program Operating Manual (NISPOM) sets forth specific and detailed requirements that govern the potential export of such materials, and these, plus ITAR, must be followed, with no exceptions allowed, before any classified document may be exported to a foreign person or entity. At a minimum, the following basic steps must be taken: (a) contact the Defense Security Service Industrial Security Representative (DSS ISR) to inform that office of the desire to export classified material; (b) verify with DSS ISR the proper procedures to follow; (c) review the current Security Classification Guide (DD 254) for the classified material to verify the exact level of classification and determine whether there are any special classifications; (d) contact the Government Contracting Agency (GCA) to obtain its agreement and approval to export the classified material to the proposed foreign recipient; (e) contact the Cognizant Security Agency (CSA) "at the earliest possible stage in deliberations that will lead to the international transfer of classified material," and obtain CSA's agreement and written approval to export the designated classified material to the proposed foreign recipient; (f) contact the Defense Industrial Security Clearance Office (DISCO) to obtain written verification that the intended foreign recipient has the proper clearance, classified storage capability, and classified handling procedures in place; (g) submit an application to export classified data to the State Department's Office of Defense Trade Controls (ODTC) for approval, and obtain ODTC's written approval and limitations; (h) prepare written transmission instructions for export of the classified materials, and submit them to the CSA for approval; (i) coördinate with the CSA the identification of the

33

Designated Government Representative (DGR) for the United States and the identification of the DGR of the government of the foreign recipient's country who will carry out the mandatory government-to-government transfer of the classified materials; and (j) prepare the necessary paperwork and packaging for visual review and verification by the U.S. DGR before export.

67.     If all steps set forth in the preceding paragraph have been successfully completed and all necessary coördination, verifications, and authorizations have been obtained, a foreign shipment of classified material may take place only through government-to-government channels. Exactly as is the case with registered mail carried by the Postal Service, a continuous chain of written receipts reflecting all transfers must be meticulously maintained throughout the entire government-to-government export process.

**B.     <u>Illegal Export of Controlled LIF Drawings</u>**

68.     In 1999 the LIF's for ITT NV's equipment were manufactured by an American company located in California (California Company) under a sub-contract with ITT NV. In an effort to reduce its costs and thereby increase ITT's profits, Manager B applied pressure to the California Company to lower the price of the LIF (target price). In response, the California Company explored the possibility of using a company located in the People's Republic of China to manufacture the LIF's substrate lens because manufacturing and labor costs in China are substantially lower than elsewhere. On July 23, 1999, the California Company applied for an export license to send the drawing for the LIF substrate lens to a company located in Shanghai. Not surprisingly, the State Department

34

rejected this application on August 16, 1999 for reasons of "National Security" because "China is a prohibited destination pursuant to ITAR."

69.    On February 17, 2000, the California Company sent Manager B an e-mail stating that one of the main reasons it was having problems meeting the target price was because the State Department had denied it permission to manufacture the LIF substrate "off-shore." On week later, on February 24, the license application and the State Department's letter denying the California Company's request to manufacture the LIF substrate lens in China were faxed to Manager B. Manager B subsequently recommended that the California Company explore using the Singapore Company to manufacture the LIF substrate lens. In response, the California Company sent an e-mail to the Singapore Company to obtain a price quote. Not realizing that the request had originated with ITT NV, the Singapore Company declined to provide a price quote on the ostensible ground that their "capacity" was "fully over loaded." After learning that the Singapore Company had declined to provide a quote, Manager B sent an e-mail to a high-level manager at the Singapore Company on February 28, 2000. The February 28 e-mail stated in pertinent part: "I was both surprised and disappointed that you were to [sic] busy to take on more business!? I would have offered [the Singapore Company] the opportunity to quote the whole LIF assembly but, because the coating is US Government Classified it can not go off-shore." Reversing its "fully over loaded capacity" position, the Singapore Company immediately responded that because this was in reality a project for ITT NV, it could "take

on more job." The Singapore Company subsequently provided the California Company with a favorable quote to manufacture the LIF substrate lens.

70.    Despite receiving a favorable quote from the Singapore Company, the California Company notified Manager B on March 27, 2000 that the "financial performance" of the LIF manufacturing program was "very, very poor," and that the California Company would need to increase the price that it was charging ITT NV for the LIF. The California Company also stated that it would understand if ITT NV decided to get another supplier for the LIF. On August 17, 2000, Manager B informed the California Company that ITT NV was exploring the possibility of using other suppliers and that ITT NV had gotten a favorable quote from another company. On October 9, the California Company informed Manager B that it was probably going to transfer all its "coating work" to its U.K. facility. After discussing and agreeing that the classified specification for the LIF could not be transferred to its U.K. facility, Manager B indicated that ITT NV would probably "want to do a last-buy to cover [their] future needs." On October 16, 2000, the California Company sent Manager B an e-mail confirming that it had decided to transfer the coating business to their U.K. facility, and that it needed to know "ASAP" the "quantities and time-frame" for a "last-and-final buy from" the California Company. The e-mail also stated that, "Your [LIF] coating, being classified, can't be transferred as we recently discussed." In response, on October 18 Manager B told the California Company that ITT NV wanted to "add-on 4,000 additional pieces to their Dec. Delivery as their last-and-final buy." When, on November 6, 2000, the California Company informed ITT NV

36

that the price for the add-on to the "last-and-final buy" was "$120K more than they would have paid with our old price," Manager B asked for "30 days to see if they can get someone else to take up this program since they are ultimately going to have to get someone to do it anyway." Manager B also indicated that they had gotten quotes from two other companies to manufacture the LIF.

71.    Despite the fact that ITT NV had received quotes for the production of the LIF from two other companies, by the end of March 2001 Manager B had still not arranged for a replacement for the California Company. Manager B's delay in identifying a new manufacturer of the LIF's was quickly building to a crisis. As Manager B explained in an April 1, 2001 e-mail to the Singapore Company, "[t]his issue is becoming critical for me. I will need new parts by June-July timeframe. My third new source just quoted me (after a month delay) with a 10 month lead time." In fact, the crisis became so acute that by the end of May 2001, ITT NV had to ask the Army for permission temporarily to store night vision equipment intended for delivery to the Army in a warehouse until ITT NV was able to supply the required LIF's.

72.    Despite being fully aware that the classified specification for the LIP could not be exported, in his April 1, 2001 e-mail Manager B asked whether the Singapore Company could manufacture the LIF for ITT NV. In his effort to find a new LIF manufacturer, Manage B ignored the ITAR requirements -- which requirements he was completely conversant with -- and illegally faxed to the Singapore Company a "drawing package" for the LIF without obtaining a State Department license or notifying anyone in

the government. Moreover, when he illegally exported these controlled LIF drawings to the Singapore Company, Manager B made no effort to ensure that the Singapore Company was aware of the sensitive nature of the drawings or the precautions the Singapore Company was obliged to take in handling them.

73.    On April 3, 2001, Manager B again intentionally violated the law by electronically exporting to the Singapore Company by e-mail additional export-controlled LIF drawings without obtaining a State Department export license. As before, Manager B made no effort to ensure that the Singapore Company was aware of the sensitive nature of the drawings or the precautions the Singapore Company was obliged to take in handling them.

**C.    Illegal Production of the LIF Substrate in the People's Republic of China**

74.    When the Singapore Company received the LIF drawings package it prepared an export-controlled derivative LIF drawing based on the illegally exported LIF drawings. Given that Manager B had made it pellucid that the LIF's cost had to be "very competitive," and since he had previously recommended that the Singapore Company use its "facilities" located in "China," the Singapore Company exported the controlled derivative drawing to an optics company located in the People's Republic of China, a prohibited ITAR destination. The Singapore Company also issued an order for the production of thousands of LIF substrates. With the export-controlled derivative LIF substrate drawing and the purchase order in hand, the Chinese optics company quickly

began production of the LIF substrates in China.   Ultimately, the Chinese company manufactured thousands of the LIF substrate lenses.

75.     While arranging for the production of the LIF substrate, Manager B also turned his attention to the issue of coating the LIF substrates.   Because the Singapore Company was incapable of performing the coating work, Manager B, at its suggestion, turned to a sister company of the Singapore Company located in the U.K. to do the LIF coating work.   Because the Singapore Company had already sent a copy of the export-controlled LIF drawing the U.K. company, Manager B turned his attention to providing a copy of the classified LIF specification to the U.K. Company.

**D.     Illegal Export of the Classified LIF Specification**

76.     On April 2, 2001, Manager B sent an e-mail to another ITT NV manager explaining the problems he was having finding a new LIF supplier.   In his e-mail, Manager B explained that the "LIF specification is very demanding and worse, *it is a classified specification which prevents us from going to off-shore coating suppliers*."  (emphasis added).   In response to this e-mail, the other manager contacted a government employee who worked at the Army Night Vision Lab to see if there was any way that ITT NV might be able to use an "off-shore coating supplier."   On April 6, 2001, the other manager informed Manager B and others at ITT NV that the government employee he contacted stated that using an "off-shore" coating supplier would be "a long road or tough to do." Despite his knowledge that the classified LIF specification could not go to an "off-shore coating supplier," that it could not go to the U.K., and that any attempt to get the

government's permission to go "off-shore" would be "a long read or tough to do," on April 6, 2001, Manager B sent an e-mail to the Singapore Company asking for the "name and e-mail/telephone # of the security officer" at their U.K. sister company so he could "expedite the transfer of the [classified LIF] specification" to the U.K. company.

77.    To obtain a copy of the classified LIF specification, Manager B contacted another ITT NV manager, John Doe defendant Manager C (Manager C), who had access to the classified information.  After explaining to Manager C the pressing need to send the classified information to the U.K. company, Manager C made an effort to locate a copy of the classified LIF information.  When he was unable to find a copy of the classified LIF specification in the ITT NV classified safe or elsewhere, Manager C contacted the Army to obtain a new copy.  During his contact with the Army, Manager C made no mention of the fact that the Company intended to export the classified information to the U.K.  On April 5, 2001, the Army sent a copy of the classified information to ITT NV based on the trust and confidence it reposed in Manager C and in ITT NV.

78.    In addition to obtaining a copy of the classified LIF specification, Manager C also contacted ITT NV's government DSS ISR to obtain a contact number for DISCO, which contact numbers the DSS ISR provided to Manager C on April 9, 2001.  Despite the fact that Manager C and the DSS ISR worked with each other routinely, and the DSS IRS would have been the primary government person to consult about transferring classified information to foreigners, Manager C never mentioned that the Company intended to export the classified LIF specification to the U.K.  On April 10, without the DSS ISR's

40

knowledge, Manager C contacted the section of DISCO responsible for confirming whether a foreign company or person has a security clearance and asked whether the U.K. Company located at a specified U.K. address had a security clearance. In addition, at Manager B's request, on April 10, 2001, Manager C contacted the U.K. Company's security supervisor to "verify the clearance level of your facility."

79.    On April 17, 2001, the U.K. Company sent an e-mail to Manager C informing him that they had been unable to find a copy of the classified LIF specification, and instructing him to send the it to their sister company at a different U.K. address, since "[t]hey are cleared to receive classified materials." Manager C forwarded this e-mail to Manager B, and also informed him that after he received the U.K. Company's e-mail he had contacted DISCO to determine the status of the request to verify the U.K. Company's security clearance. Manager C further informed Manager B that the government had "just received appropriate documentation per our request and are currently confirming." Manager C concluded by stating that it "[m]ay be another day or so before I have official confirmation" by "fax." On April 18, DISCO sent a fax to Manager C informing him that a sister company with another U.K. address held a "SECRET/NATO SECRET" clearance. The April 18 DISCO did not indicate that the U.K. Company itself had any type of clearance.

80.    ITT NV had not obtained the government's permission to send the classified LIF specification to the U.K. Company or to any foreign entity or person. ITT NV had not received any government verification that the U.K. Company held an appropriate

41

clearance. The U.K. Company -- and, separately, DISCO -- had indirectly informed ITT NV that the U.K. Company was not a cleared facility. ITT NV had not obtained a State Department license to export the classified LIF specification to the U.K. Company. And, the U.K. company had specifically instructed ITT NV to send the classified LIF specification to the U.K. Company's sister company at a different address. On April 2, Manager B had sent an e-mail in which he wrote, "*it is a classified specification which prevents us from going to off-shore coating suppliers.*" Despite all this, just 16 days later -- to wit, April 18, 2001 -- Manager C, at Manager B's direction, illegally sent through the U.S. Mail, in blatant and egregious violation of the NIPSOM and ITAR, the classified LIF specification to the U.K. Company -- a facility without any clearance or authority to receive classified information.

E.    **Illegal Production of the LIF's**

81.    On April 21, 2001, the U.K. Company's managing director sent an e-mail to Manager B informing him that the U.K. Company had not yet received the classified LIF specification, stating that he was "concerned that it may be lost in either the U.S. or U.K. postal system." The next day, April 26, the U.K. Company received the classified LIF specification, which was delivered through the Royal Mail. The U.K. Company's managing director informed Manager B that he had sent the specification to a facility that lacked a security clearance. When the managing director asked Manager B what he wanted to do next, Manager B instructed him to open the package containing the classified LIF specification and prepare the requested price quotation for the manufacture of the LIF's.

42

82.    On May 22, 2001, after a number of uncleared U.K. Company employees had reviewed the classified LIF specification, the U.K. Company's general manager sent Manager B a price quotation for the manufacture of LIF's for delivery beginning in "late June/early July dependent on [U.K.] export license approval." On May 31, Manager B sent an e-mail to the U.K. Company stating, "[a]t this time we are planning on buying 24,000 pieces at 2000 per month with deliveries the first of each month. We will need the first production units for our August deliveries. We will need them here in time to complete the final assembly. I am hoping to be able to get your first article samples this month." On June 11, the U.K. Company's general manager sent an e-mail to the ITT NV Purchasing Manager stating that the U.K. Company expected to have 20 LIF's ready to ship to ITT NV "this month."

83.    Despite the fact that the LIF substrates and the coated LIF's were well along their way to production, Manager B did not initiate any internal requests for the required export license applications with ITT NV's export control personnel until May 24, 2001. On that date, Manager B filled out an internal ITT NV form requesting, *inter alia*, a license to transmit to the U.K. Company some of the LIF drawings he had previously sent to the Singapore Company. Manager B, however, did not indicate that the Singapore Company had itself sent at least one of these drawings to the U.K. Company and that the U.K. Company had used this drawing in preparing its price quotation. Manager B also lied on the internal ITT NV application when he stated that the U.K. Company had been "cleared to accept" the classified LIF specification "through the DSS." Finally, on June 8, 2001, an

43

ITT NV export compliance employee directly asked Manager B whether the Singapore Company would "have access to the drawings at all." She posed this question because she understood that if the Singapore Company had access to the LIF drawings, then ITT NV "should list them on the license too." Despite the fact that Manager B had already illegally exported the same LIF substrate drawing to the Singapore Company without a license, he lied and told her that the Singapore Company would not have any access to the LIF drawings, and therefore would not need to be listed on the license application.

84.    On June 12, ITT NV submitted a license application to the State Department to export a LIF drawing (Drawing Number 273220) to the U.K. Company. ITT NV falsely indicated on the license application that the shipment of the LIF drawing was a "completely new shipment." Nonetheless, the State Department rejected the application on August 7, stating in relevant part: "The drawing is of no value without specifications. The specifications are classified as 'secret/no foreign.' Light interference filters [LIF] are the critical technology for electro-optical countermeasures systems for USG military/national security night vision systems. You have not justified why you want to purchase these components from a foreign source. If ITT Night Vision wants to pursue this offshore procurement, ITT Night Vision should obtain the concurrence of the Army, especially the Night Vision laboratory, before resubmitting." Despite the facts that (a) ITT NV had no export license in place to obtain LIF's from a foreign source and (b) it was submitting a license application to the State Department, ITT NV issued a purchase order for 20 LIF's on June 12, 2001.

44

85.    The next day -- June 13 -- an ITT NV employee mentioned, during a discussion with an Army Night Vision Lab employee, that ITT was obtaining LIF's from a foreign source.  When the Lab employee inquired how ITT NV was able to do so, given the fact that the LIF specification was designated "No Foreign" (NOFORN), the ITT NV employee was unable to respond.  DSS was notified of the compromise of classified information, leading the DSS ISR to tell Manager C to get the classified documents returned in a proper manner through government-to-government channels, *i.e.*, not using the Royal Mail or the U.S. Postal System.  Accordingly, on July 3, Manager C sent an e-mail to the U.K. Company's General Manager requesting return of the classified LIF specification, to which the General Manager responded on July 4, stating that the specification would be returned that day.  Instead of being returned properly through government-to-government channels, however, it was sent back the way it had come -- through the U.K. and U.S. postal systems.  Manager C signed a postal receipt for the return of the classified LIE specification on July 17.

86.    On August 22 and again on August 27, 2001, the State Department issued a written demand that within 30 days ITT provide a wide variety of information about ITT NV's violations relating to the classified LIF specification compromise, including the return of "All technical data (classified and unclassified) and/or defense articles sent to the U.K."  Despite the State Department's demand for the return of the classified LIF specification, ITT failed to return it within the 30-day time limit.

87.    On March 1, 2002, ITT NV informed the State Department that it had turned over "all classified information requested." In light of the timing and substance of this response, the government obtained a search warrant to search for a variety of evidence, including the classified LIF specification. The search warrant was executed on October 29, 2002. During the search of ITT NV's classified safe conducted pursuant to the warrant, federal agents recovered the missing classified LIF specification that the U.K. Company had returned in July 2001.

88.    In addition to failing to return the classified LIF specification, ITT NV continue to push forward with the illegal foreign production of LIF's even though (a) it knew that it had illegally exported the LIF specification to the U.K. Company; (b) the DSS ISR had demanded immediate return of the LIF specification; (c) the DSS ISR was conducting an on-going investigation of the compromise of the classified information; and (d) ITT NV had no export license for the foreign production of LIF's. For example, on July 6, 2001, ITT NV issued a second purchase order to the U.K. Company for the manufacture of 20,000 LIF's for delivery beginning August 1, 2001. Even when Manager B learned that the U.K. Company had retained a copy of the LIF specification after it had claimed to have returned it, Manager B continued to press ahead with the manufacturing process, and even provided direct assistance to the U.K. Company.

89.    By way of example, on July 30, the U.K. Company's Product Assurance Manager sent an e-mail to an ITT NV employing stating, "Can you help clear up one issue on the LIF filters. There is a discrepancy between the spherical power specification in the

Mil spec and your drawing.  As per the detail of the Mil spec this document should take precedence, however can you confirm that this is correct.  Thank you for your assistance." After obtaining the answer from Manager B, the ITT NV employee replied, "[t]he Mil. Spec. takes precedent [sic]."  ITT NV never told the government that the U.K. Company had retained a copy of the classified LIF specification, and the government has to this day been unable to recover the copy that the U.K. Company made.

90.    It was not until August 9, 2001 that ITT NV asked the U.K. Company, at the government's specific direction, to halt LIF production.  By that date the U.K. Company had delivered 20 completed LIF's to ITT NV, had manufactured 518 LIF's that passed testing standards, and had generated a significant amount of new classified test data related to testing LIF's.  It was not until February 6, 2002 that ITT NV finally put the LIF purchase order on "hold indefinitely" status.  By that time, the U.K. Company had produced at least 1000 coated LIF filers, and the Singapore Company had manufactured as many as 20 LIF substrates in China.  Many of these LIF's and LIF substrates have never been recovered, and all of them could  wind up in the hands of America's battlefield enemies.

**Export Violations Relating to the Enhanced Night Vision Goggle System**

**A.    ENVG Background**

91.    In July 2000, the Army awarded a development contract to ITT NV and several other U.S. defense contractors to study the area of helmet-born night vision technology.   The study contract made clear that the Army was looking for a "[r]evolutionary approach (versus evolutionary)" towards the development of a night vision

goggle that would replace the night vision goggles in production at that time. (A Hollywood-based example of 1990s night vision goggle technology can be seen in the 1992 Harrison Ford movie *Patriot Games* where, in the movie's final scenes, the splinter-group IRA faction that has been trying to take down Ford's character Jack Ryan invades his house on the Eastern Shore of Maryland while wearing a 1990s ENVG system.)

92.    The contract was divided into two phases. In phrase one, ITT NV was obligated to produce a report that set forth and evaluated "conceptual designs" for an Enhanced Night Vision Goggle (ENVG). In phase two, ITT NV was to develop, build, and test "prototype ENVG units." The Army awarded ITT $1,843,000 over the life of the initial development contract.

93.    Phase One of the initial development contract concluded in December 2000. The Army evaluated the reports submitted and decided to move forward on a "revolutionary" night vision goggle system. This new ENVG system would combine the strengths of night vision technology with the strengths of thermal imaging technology. The Army hoped to give its soldiers a distinct battlefield visual advantage by optically blending the two systems' visual images into one system and one image. If successfully developed, not only would American soldiers be able to see in the dark, but they would also be able to see through smoke, clouds, and other obscurants, an advantage that could mean the difference between life and death on the battlefield.

**B.**    <u>Pre-2002 Illegal ENVG Exports to Singapore</u>

94.    In 2001, the Army moved forward with phase two of the development contract and requested the production of several different ENVG prototypes from several defense contractors, including ITT NV.  ITT NV turned to the Singapore Company to produce an ENVG prototype.  The Singapore Company thereafter assigned a Singaporean optical designer to work on the ENVG contract.  Without obtaining any of the necessary export licenses, ITT NV and the Singapore Company began to work collaboratively on the design and development of the ENVG prototype.   In connection with this joint development work, ITT violated ITAR by shipping export-controlled drawings to the Singapore Company without having first obtained the required export licenses.  ITT NV even brought the Singapore Company's optical engineer to the United States to work side-by-side with his ITT NV counterpart inside ITT's Roanoke, Va. facilities without notifying or getting any type of approval from the State Department.

95.    After conducting tests on the ENVG prototypes that the defense contractors involved in the ENVG competition delivered to the Army, the Army, towards the end of 2001, made of series of technology selections and awarded additional money through a second development contract for the development, production, and testing of additional ENVG prototypes.  The Army gave ITT NV $1,204,000 pursuant to this second development contract.  When the second contract came to an end, the Army gave ITT NV an additional $4,175,000 in 2003 pursuant to a third ENVG contract.  In total, ITT NV received $7,232,000 from the Army during the developmental phase of the ENVG program.

96.    The Singaporean optical engineer who had worked with ITT NV during the development of the first ENVG prototype left the Singapore Company during the summer

49

of 2001. ITT NV therefore turned to a group of optical designers employed by the Singapore Company to work collaboratively with ITT NV engineers to develop the next ENVG prototype. Again, however, ITT NV failed to obtain the necessary export licenses from the State Department. Among the Singapore Company optical engineers who were collaboratively working with ITT NV on ENVG design and development were two who were Chinese citizens, even though China was a prohibited destination for export-controlled information. The Chinese optical engineers routinely enjoyed access to export-controlled drawings and specifications until 2003, when they left Singapore and returned to China. Moreover, ITT NV routinely shipped export-controlled ENVG drawings and specifications to the Singapore Company without a State Department license throughout the developmental phase of the ENVG program. ITT NV's disregard of ITAR during the developmental phrase was harmful to the interests of the United States: as an ITT NV optical engineer stated in an e-mail discussing the need to protect the ENVG system's optical design, "[b]y knowing the optical train of the ENVG. . .they can determine how the whole system works."

97.    Some managers at ITT NV were personally aware that the Company was working collaboratively with, and sharing export-controlled drawings with, the Singapore Company without an export license. Nonetheless, no effort to obtain such a license was considered until September 2002. At the request of an ITT NV manager, John Doe defendant Manager D (Manager D), ITT NV engineers prepared a draft of an amendment to the ITT NV/Singapore Company TAA for submission to the State Department. This draft agreement listed 20 specific export-controlled drawings by number that "ITT and [the Singapore Company] need to trade information on" that were not listed on the TAA Annex. Thirteen (13) of the listed drawings related to night vision goggle systems in production,

and the remaining 7 drawings related to ENVG "optical assemblies used on systems being developed." The draft amendment also made clear that ITT NV and the Singapore Company had worked collaboratively on the design of export-controlled night vision optics "*since the 1980s*." Submission of the amendment would have informed the State Department that not only was ITT NV illegally working with the Singapore Company on the design and development of the highly sensitive ENVG system, but also that *ITT NV had been illegally working with the Singapore Company for more than 20 years*. Given the immediate and obvious implications of revealing this information to the State Department, ITT NV never submitted the draft amendment.

98.    In the summer of 2003, ITT NV became so concerned about its relationship with the Singapore Company that it decided to stop working with it on future ENVG designs. Instead, ITT NV began a search for an American partner which it could legally work on future ENVG designs. After a selection process, ITT NV selected an American company (American Company) to take the Singapore Company's place in the design of future ENVG optics. The American Company, with the assistance of other American companies, eventually redesigned the entire "optical train" for the ENVG system.

99.    By the end of 2003, Manager D was openly informing other ITT NV employees that the Company did not have a license to export ENVG documents to the Singapore Company, and that the Company needed to obtain an amendment to its existing technical assistance agreement if it wished to continue to "undertake detailed design collaborative efforts for ENVG optics." ITT NV needed to continue to work with the Singapore Company with regard to production of the existing prototype ENVG design for delivery to the Army. In July 2004, therefore, Manager D once again asked an ITT AV engineer to draft an amendment to the existing ITT NV/Singapore Company TAA for

submission to the State Department. This amendment, like the previous one, was never submitted because it would never have received State Department approval. Despite the clear understanding that ITT did not have a license to export ENVG drawings and specifications, Manager D continued to authorize ITT NV personnel routinely to export controlled drawings and specifications in violation of ITAR. With the full personal knowledge of ITT NV management, ITT NV personnel even went to the extreme of exporting to the Singapore Company, on February 27, 2004, the most up-to-date export-controlled ENVG performance specifications, including information related to the pertinent thermal optics, a highly sensitive part of the ENVG system that the Singapore Company had no responsibility for and which it never worked on. ITT NV decided to export these latest ENVG performance specifications to the Singapore Company so that it would be ready to assist ITT NV when it came time for full production of the ENVG optical components and assemblies in 2006.

**C.    Post-2004 Illegal ENVG Exports to Singapore**

100.    With the knowledge that ITT NV was routinely violating ITAR requirements, in 2003 Manager D and other ITT NV managers began looking for a way to circumvent sending export-controlled ENVG technical data *directly* from ITT NV to the Singapore Company, as well as for a way to shift the legal responsibility for the export of ENVG technical data to someone else. On February 23, 2004, Manager B, with the knowledge of Manager D, wrote an e-mail to the Singapore Company stating, "I am sorry to say that I am extremely disappointed in the efforts so far to establish a domestic U.S. operation and specifically to find an optical engineer. We are continuing to falter here in our efforts to re-design the ENVG optics while complying with U.S. export regulations.

This is forcing us to consider finding a U.S. domestic source for ENVG optics and future optical assembly's [sic]."

101.    Manager B went on to say that if the Singapore Company ". . .did find a domestic engineer, that person would have to be employed by a [Singapore Company parent]. . .division that was incorporated in the U.S. (*i.e.*, [. . .] Rochester). If the engineer were employed by . . .[the Singapore Company] then they would be considered a foreign national no matter what their citizenship." In response, the Singapore Company hired an optical engineer who was a U.S. citizen (John Doe defendant American engineer, or American engineer) and attached him to a sister company located near Rochester, N.Y. (Rochester Company). The Singapore Company was willing to do this for ITT NV because ITT NV was its largest customer. The loss of ITT NV's business to a domestic U.S. competitor, as threatened in Manager D's e-mail, would have had an enormous negative impact on the Singapore Company and its sister companies.

102.    On June 10, 2004, Manager B and Manager D met with the management of the Rochester Company and others to discuss shifting responsibility, to the Rochester Company, for the export of ITT NV ENVG technology to the Singapore Company. During the meeting, Manager B and Manager D explained that ITT NV was developing the "next generation" of night vision equipment, called ENVG. Manager D stated that while ITT NV had a TAA with the Singapore Company, that TAA did not cover ENVG. Manager D also stated that ITT NV believed that the State Department would disapprove an amendment to the TAA that would cover ENVG. ITT NV, therefore, proposed to share

ENVG-related technical data with the American optical engineer hired by the Singapore Company, who was attached to the Rochester Company. Under this scenario, it would be the Rochester Company rather than ITT that would be responsible for exporting any export-controlled technical data to the Singapore Company. Manager B made it clear that if the Rochester Company did not agree with this proposal, ITT NV would take its business elsewhere. Despite the facts that the Rochester Company (a) was not involved in the development or production of night vision equipment; (b) had virtually no experience with the export of controlled technical data; and (c) did not employ anyone who had even a basic working knowledge of ITAR's requirements, it ultimately agreed to ITT's proposal because ITT NV was such a critical customer.

103.    Before the June 10 meeting, the Rochester Company had submitted a request for a TAA between itself and its Singapore sister company (Rochester/Singapore TAA). In that May 14 request, the Rochester Company applied for an export license to provide "services to design and develop optical components, optical assemblies, and opto-mechanical assemblies for use in defense products like night vision equipment." The request further requested permission for the Rochester Company to share its designs with the Singapore Company to enable the Singapore Company to manufacture the Rochester Company's designs on a "build-to-print" basis in Singapore. The State Department approved the Rochester/Singapore TAA on June 29, 2004, with a series of limitations. The TAA became effective on January 4, 2005, when the Rochester Company's president signed it.

54

104.    After the Rochester/Singapore TAA became effective, the American engineer attached to the Rochester Company sent a copy of the TAA, the TAA transmittal letter, the State Department's approval letter, and other documents related to the TAA to Manager D for his review.  Despite the facts that (a) Manager D knew that the technical data to be exported under a TAA was required to be identified, which in this case it was not; (b) the Rochester /Singapore TAA did not list any ENVG drawing or specification, or even mention ENVG or ITT at all; and (c) the transmittal letter never mentioned any of the ENVG contracts as contracts under which the technical data to be exported was developed, on February 2, 2005, Manager D sent an e-mail to Manager B as well as to the U.S. engineers and others stating that he had reviewed the Rochester/Singapore TAA and that "the TAA appears to satisfy our requirements for establishing a U.S. sourced *lens design operation* to interface with [the Singapore Company] in Singapore."  (emphasis added)

105.    In reliance on Manager D's February 2, 2005 e-mail, ITT NV engineers began freely to share export-controlled ENVG technical data, including drawings and specifications, with the American engineer.   The American engineer, however, soon learned that the ENVG optical designs on which the Singapore Company had previously worked were obsolete, and that a new American company had resigned the ENVG optics. Despite the fact that the Rochester/Singapore TAA was limited to the export of designs created by the Rochester Company, the first thing that ITT NV asked the American engineer to export to the Singapore Company was an ITT specification and drawing for a

"Special Night Vision Goggle" (SNVG) beam combiner for a manufacturing quote for as many as 500 beam combiners in 2005 and for "10,000/year for 2006 and beyond."

106.    The ITT NV engineers made it clear that they did not want the American engineer to work on either the design or the drawing of the SNVG beam combiner. In fact, the American engineer was not qualified to work on the design of a beam combiner. ITT NV merely wanted the American engineer to act as a conduit for the export of ITT's SNVG beam combiner specifications and drawing. In order to hide the fact that the SNVG beam combiner specification and drawing really comprised the latest and most up-to-date specification and drawing for the ENVG beam combiner, an ITT NV engineer replaced all references in the ENVG beam combiner specification with the fictitious name "Special Night Vision Goggle," or "SNVG," before giving it to the American engineer for export to the Singapore Company.

107.    Before he exported ITT's "SNVG" to the Singapore Company, the American engineer felt it appropriate to consult with Manager D because he himself had absolutely no experience with exporting controlled documents, and had had only two days of ITAR training from an introductory ITAR course. On March 1, 2005, after Manager D had given him specific permission to export the "SNVG" beam combiner specification and drawing, the American engineer sent the "SNVG" export-controlled  documents to the Singapore Company by fax. In his transmittal letter to the Singapore Company, the American engineer stated that he believed that "these updated requirements are for the ENVG and that the term 'SNVG' *was used as a decoy*." (emphasis added)

108.    ITT NV's knowing use of a "decoy" specification was further illuminated in a subsequent conversation between Manager D and the American engineer.  On March 7, 2005, the American engineer called Manager D to get his permission to export an electronic copy of the ENVG beam combiner drawing to the Singapore Company.  During the course of the conversation, Manager D asked the American engineer to remove all "ITT markings" from the ITT documents exported to the Singapore Company.  Manager D explained that he wanted all references to ITT removed because "he prefers that TAA's be very specific, and ours [the Rochester/Singapore TAA] is not."  After further discussion, Manager D backed away from his request to remove all ITT markings.  Even with the full knowledge that the Rochester/Singapore TAA was not specific and did not permit the transmittal of ITT NV's export-controlled ENVG drawings and specifications, Manager D still gave the American engineer approval to send the electronic version of the export-controlled ENVG beam combiner drawing to the Singapore Company.

109.    Throughout the rest of 2005, whenever ITT NV personnel asked the American engineer to transmit ENVG drawings and specifications to the Singapore Company, he requested and received specific permission for the exports from Manager D or other ITT NV employees.  With Manager D's blessing, the American engineer illegally exported without a license ITT's most up-to-date ENVG specifications and drawings to the Singapore Company. By September 2005, ITT NV had illegally exported the entire ENVG "optical train" through the Rochester Company.  ITT NV caused these illegal exports to take place in an effort to have the Singapore Company ready to "reënter" ITT NV's new

57

production schedule "by the March 2006 date for production." As one ITT NV engineer recognized in an e-mail he sent to another ITT NV engineer, the whole relationship between the Rochester Company and ITT NV was nothing but a "front" for an effort to circumvent U.S. export laws.

110. ITT NV's intent to establish a "front" for its illegal (and successful) effort to circumvent U.S. export laws was made even clearer by the nature of the relationship between the American engineer and the Rochester Company. Despite the fact that ITT NV was specifically aware of the fact that -- and had informed the Singapore Company -- that if the American engineer was not an employee of the Rochester Company, any exports sent by him or under his direction would be illegal, in fact the American engineer was in reality an employee of the Singapore Company who was merely attached to the Rochester Company. The American engineer was hired by the Singapore Company, he was supervised by Singapore Company personnel, his work was controlled by the Singapore Company, and all expenses incurred by the Rochester Company to support the American engineer were reimbursed by the Singapore Company. The American engineer was not even listed on the Rochester Company personnel chart, and he was openly referred to as a Singapore Company employee. As an employee of a foreign company, the American engineer had no right to export anything to the Singapore Company under the Rochester/Singapore TAA.

58

**D.    Illegal ENVG Exports to Japan and China**

111.    ITT NV engineers encountered difficulty obtaining a critical switch for the ENVG system during its developmental phrase.  After experimenting with several existing switches, ITT NV concluded that it would have to design its own unique switch.  In 2003, an ITT NV engineer successfully designed a unique switch (ENVG switch) that met the ENVG system's specific requirements.

112.    ITT NV turned to the U.S. office of a Japanese company to manufacture the ENVG switch.  Despite its full awareness that drawings and information about the ENVG switch constituted export-controlled items that would require an export license to be shipped to Japan, ITT NV failed to make any attempt to obtain the necessary export license before exporting such ENVG switch information and drawings.  Between September 2003 and December 2005, ITT NV worked collaboratively with the Japanese company in an unlicensed and illegal effort to produce a final ENVG switch.  During this unlicensed collaborative design and production process, ITT NV illegally exported a series of ENVG switch drawings to the Japanese company, including the final ENVG switch design.  Pursuant to ITAR, ITT NV had included, on some of these drawings, specific statements that identified the drawings as export-controlled.

113.    During the course of design and production of the ENVG switch, the Japanese company specifically informed ITT NV that to reduce production costs it intended to use a sister company located in China (Chinese Switch Company) during the manufacturing, assembly, and testing process.  Despite ITT NV's acute awareness, derived

from its prior illegal activities as described above, that China was a prohibited destination for export-controlled military items, ITT NV made no effort to prevent the Japanese company from exporting the ENVG switch designs to China.  In fact, all of the export-controlled drawings and technical information that ITT NV illegally provided to the Japanese Company were subsequently transferred to the Chinese Switch Company, which ultimately produced hundreds of switches that were shipped to the Japanese company and then to ITT NV.  While ENVG switch manufacturing was eventually shifted to Japan, the Chinese Switch Company remained involved in the assembly and final testing of the ENVG switches until April 2006.  The relationship between ITT NV, the Japanese company, and the Chinese Switch Company did not end until April 2006, when the illegal and unlicensed relationship between the three companies was fully uncovered.

114.    Defendants' conduct as described herein jeopardized the safety of our battlefield troops to achieve short-term financial gain.  Their conduct, to which ITT has now pleaded guilty, caused the Company a measurable pecuniary loss of $100 million, plus incalculable reputational loss.

115.    As a result of its felonious behavior, ITT was charged with three felony counts of violating the Arms Export Control Act of 1976. Count I charged ITT with violations of 18 U.S.C. § 2, 22 U.S.C. §§ 2778(b)(2) and 2778(c), and 22 C.F.R. §§ 127.1(a) 127.3. Specifically, Count I of the Criminal Information ("Willful Violation of the International Traffic in Arms Regulations, Export of Defense Articles Without a License") charged that:

On or between March 2001 and August 2001, in the Western District of Virginia, the defendant, ITT Company, did knowingly and willfully export and cause to be exported from the United States to Singapore, the People's Republic of China, and the United Kingdom, defense articles, that is, technical data related to a laser counter measure (also known as a "light interference filter") for military night vision goggle systems, which were designated as defense articles on the United States Munitions List, without having first obtained from the Department of State a license or written authorization for such exports.

116.    Count II charged ITT with violations of 22 U.S.C. § 2778(c) and 18 U.S.C.

§ 2. Specifically, Count II of the Criminal Information ("Omission of Statements of

Material Fact in Arms Exports Required Reports") charged that:

On or between April 2000 and October 2004, within the Western District of Virginia, the defendant, ITT Company, did knowingly and willfully omit material facts from required reports that were necessary to make the statements in the reports not misleading, that is, that ITT Company was aware that it was violating its export licenses for the temporary export or consignment of night vision goggles or night vision parts to foreign persons for years before informing the Department of State about the violations, and that ITT Company failed to take significant corrective action to stop the ongoing violations until shortly before it informed the Department of State about the violations.

117.    ITT was also charged with a third count ("Willful Violation of the

International Traffic in Arms Regulations, Export of Defense Articles Without a License"),

charging that:

On or between January 1996 and May 2006, within the Western District of Virginia, the defendants, ITT Company, did knowingly and willfully export and cause to be exported from the United States to the People's Republic of China, Singapore, and Japan, defense articles, that is technical data, including drawings and specifications and defense services related to military night vision goggles systems,

61

> including the Enhanced Night Vision Goggle System, which were
> designated *as* defense articles on the United States Munitions List,
> without having first obtained from the Department of State a license
> for such exports or written authorization for such exports.

Although the government has agreed to defer action regarding this count for five years, that

deferment is contingent on ITT's implementation of an extensive Remedial Action Plan.

118.    According to its Report on Form 8-K filed with the SEC on March 30, 2007,

in addition to its $100 million penalty, as a result of its guilty plea ITT has become subject

to automatic statutory "debarment" from future export licenses. For instance, the State

Department has placed restrictions on ITT's shipment of technical data and night vision

equipment to specific parties, to remain in effect for a period of not less than one year.

119.    Moreover, although the State Department has not yet brought criminal

charges against any individual officers, directors, or employees of ITT, the United States

Attorney's Office stated on March 28, 2007 that the investigation was still in progress.

Such a statement is unusual, and indicates that more criminal charges can be expected.

120.    The gravity of the criminal charges and the size of the penalties and

forfeitures incurred by ITT reflect the seriousness of ITT's illegal sales of sensitive military

technology to potential adversaries of the United States, as well as ITT's subsequent

concealment of those sales. The severity of :ITT's criminal acts and defendants'

participation in and/or willful blindness towards these acts is escalated by the fact that such

acts were committed in a pattern and practice over a long period of time.

121.    On its corporate website, ITT delineates its Code of Corporate Conduct as

being "Doing the Right Thing -- Always." Notwithstanding such lofty sentiment, as a

result of the foregoing acts of misconduct, ITT became the first major defense contractor to be convicted of a criminal violation under the Arms Export Control Act of 1976, and was given one of the largest penalties ever in a criminal case. These acts have also stripped ITT of the reputation that befits a public Company, and weakened public trust and confidence in ITT as a prudently managed institution fully capable of meeting its duties and obligations. The damage thus done to ITT as a proximate result of defendants' conduct thus greatly exceeds the $100 million in penalties and forfeitures assessed against the Company.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against All Director Defendants)

122.    Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

123.    Each Director Defendant owed the Company and its shareholders the duty to exercise due care and diligence in the management and administration of its affairs and to make information available to ITT shareholders with all due candor. Each Director Defendant owed ITT the paramount duty not to have the Company break the law, and especially not to engage in a long-standing conspiracy to violate the export laws of the United States with regard to controlled military equipment.

63

124.    The Director Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather was due to their intentional breach or reckless disregard of their fiduciary duties to the Company. By engaging in and/or failing to disclose ITT's pattern of illegal business practices, the Director Defendants recklessly disregarded their fiduciary duties to protect the rights and interests of ITT and its shareholders.

125.    To discharge these duties, each Director Defendant was required to exercise reasonable and prudent supervision over ITT's management, policies, practices, controls and financial affairs. By virtue of this obligation and diligence, each Director Defendant was required, *inter alia*, to:

        a.      exercise reasonable control and supervision over ITT's officers, employees, agents, business, and operations;

        b.      remain informed as to how ITT was, in fact, operating and, upon receiving notice or information of an imprudent, unsound, or illegal decision, conditions, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright mariner; and

        c.      conduct the affairs of the Company in an efficient business-like manner to make it possible to provide the highest quality services while operating within the bounds of the law.

        d.      In an attached press release to ITT's Report on Form 8-K filed with the SEC on March 30, 2007, defendant Loranger admitted that "[t]hese violations have

made it clear that we had gaps in our compliance program." An ITT spokesman further stated, "[t]here's no question that violations occurred," which, given ITT's recitation in the Plea Agreement that *"ITT agrees that it is pleading guilty. . .because ITT is in fact guilty,"* would appear to be something of an understatement.

126.    Accordingly, the Director Defendants either intentionally or recklessly breached their fiduciary duties to the Company by, *inter alia*, permitting or causing the Company to engage in the transactions described herein, which (a) constituted felonies, (b) were in direct and knowing violation of ITAR and the Arms Export Control Act,  and (c) were done to the detriment of the Company and its shareholders.  Specifically, ITT

a.    knowingly or recklessly disseminated, or permitted to be disseminated, misleading information to its shareholders, the investing public, and the public at large;

b.    allowed the Company to engage in a pattern of improper and felonious business practices, thereby subjecting it to serious criminal charges, fines, penalties, lawsuits, and further investigations; and

c.    failing to disclose ITT's illegal business practices to the government or to the Company's shareholders.

127.    In breach of their fiduciary duties owed to ITT and its stockholders, the Director Defendants willfully failed to prevent misconduct that caused the Company to waste its valuable assets and otherwise to expend unnecessarily its corporate funds in a manner not in its best interests or its stockholders. As a result, the Director Defendants are

65

guilty of at least inaction amounting to recklessness in failing to control ITT's employees, business, and affairs in accordance with federal law, thereby rendering them personally liable to the Company for breaching their fiduciary duties.

128.    Consequently, ITT and its stockholders have sustained and will continue to sustain injury and damages by reason of the Director Defendants' intentional breach or reckless disregard of their fiduciary duties owed to the Company and its shareholders.

## COUNT II

### GROSS MISMANAGEMENT
### (Against All Director Defendants)

129.    Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

130.    As detailed more fully herein, the Director Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage, and control ITT's operations without having ITT commit felonies.

131.    The Director Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing ITT's business and assets.

132.    By subjecting ITT to the unreasonable risk of substantial losses due to their failure to monitor, prevent, and/or report the many acts of ITT managers and controlling persons that directly and knowingly violated ITAR and the Arms Export Control Act, the Director Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the

66

management and administration of ITT's affairs and in the use and preservation of ITT's assets.

133.    During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its shareholders. As a result, the Director Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

134.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## COUNT III

### (Against The John Doe Manager Defendants For Breach of Fiduciary Duty)

135.    Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

136.    As detailed more fully herein, the John Doe Manager Defendants each possessed a duty to ITT and its shareholders to prudently supervise, manage, and control ITT's operations over which they had control without having ITT commit felonies.

137.    The John Doe Manager Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing ITT's business and assets.

138.    By subjecting ITT to the unreasonable risk of substantial losses due to the actions of the John Doe Manager Defendants that directly and knowingly violated ITAR and the Arms Export Control Act, the John Doe Manager Defendants failed responsibly and with due care to oversee and implement proper business practices at ITT, thereby breaching their duties of loyalty and diligence in the management and administration of ITT's affairs over which they had responsibility and in the use and preservation of ITT's assets.

139.    During the course of the discharge of their duties, the John Doe Manager Defendants knew or recklessly disregarded the unreasonable risks associated with the wrongful conduct described herein, and either participated in or failed to monitor and/or disclose ITT's illegal business practices in accordance with their duties to both ITT and its shareholders. As a result, the John Doe Manager Defendants grossly mismanaged or aided and abetted in the gross mismanagement of ITT and its assets.

140.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## COUNT IV

### (Against The John Doe Law Firm For Professional Negligence and Aiding and Abetting Breaches of Fiduciary Duty)

141.    Plaintiff repeats and realleges each and every allegation set forth above as though set forth herein at length.

68

142.    The JohnDoe Law Firm owed ITT a duty to carry out its duties competently, and within the confines of the law.  It likewise had a duty not to join in, or aid and abet, any breaches of fiduciary duty of which it became aware.

143.    As detailed above, the John Doe Law Firm failed to provide competent legal advice, and to take competent legal actions.

144.    As detailed above, the John Doe Law Firm learned of actions constituting a breach of fiduciary duty to ITT, and joined in such actions, helped conceal such actions, and helped further such actions, all of which aided and abetted such breached of fiduciary duty.

145.    As a proximate result thereof, ITT and its stockholders have been damaged and will continue to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment in favor of the Company, as appropriate, against all defendants as follows:

a.    Removing and replacing the Director Defendants as the directors of ITT, instituting a new election of directors, and appointing a receiver for the management of ITT until a new election of directors is called and determined;

b.    Declaring that the Defendants have violated and/or aided and abetted in the breach of their fiduciary duties to ITT and its shareholders, or committed professional negligence;

69

c.    Awarding ITT compensatory damages against the Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

d.    Awarding ITT punitive damages against the Defendants for their egregious and willful conduct;

e.    Awarding plaintiff the costs of this action, including reasonable allowances for plaintiff's attorney's and expert's fees and expenses; and

f.    Granting such other or further relief as may be just and proper under the circumstances.

DATED: July 14, 2008

Respectfully Submitted,

**WEISS & LURIE**

By: _[signature]_

Joseph H. Weiss (JW-4534)
David C. Katz (DK-6235)
Ilya Nuzov (IN-1955)
551 Fifth Avenue
New York, New York 10176
Tel.: (212) 682-3025
Fax: (212) 682-3010

**STULL STULL & BRODY**
Jules Brody (JB-9151)
6 East 45th Street
New York, New York 10017
Tel.: (212) 687-7230
Fax: (212) 490-2022

Attorneys for Plaintiff

70

## VERIFICATION

STATE OF WASHINGTON )
                            ) ss:
COUNTY OF JEFFERSON )

      I, Robert Wilkinson, under penalty of perjury under the laws of the United States of America, declare as follows:

      1.      I am the named plaintiff in the action herein.

      2.      I have read the foregoing Verified Complaint, know its contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief based upon the investigation conducted by my attorneys.

      Executed this _10_ day of July, 2008.

                                    _____
                                         Robert Wilkinson